## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

                Plaintiff,

v.

Patrick Jon Evers,

                Defendant.

Case No. 15-cr-114 (MJD/TNL)

**REPORT & RECOMMENDATION**

Manda M. Sertich, Assistant United States Attorney, United States Attorney's Office, 300 South 4th Street, Suite 600, Minneapolis, MN 55415 (for the Government); and

Frederick J. Goetz, Goetz & Eckland PA, 615 1st Avenue NE, Suite 425, Minneapolis, MN 55413 (for Defendant).

      This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant's Motion to Suppress Statements (ECF No. 27). This motion has been referred to the undersigned for a report and recommendation to the district court, the Honorable Michael J. Davis, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

      Defendant is charged with one count of False Statement to Obtain Federal Employees' Compensation in violation of 18 U.S.C. § 1920, arising out of his employment with the United States Postal Service. (Indictment, ECF No. 1). Defendant filed his Motion to Suppress Statements (ECF No. 27), seeking to suppress statements, including a handwritten statement, made to United States Postal Service Office of

Inspector General ("USPS-OIG") Special Agents Sarah King and Rebecca Wayerski during an interview conducted on January 22, 2015. Defendant contends that the statements were involuntary in that, given the totality of the circumstances, his will was overborn. The Government opposes the motion. A motions hearing was held on July 22, 2015. (*See* ECF No. 32). Assistant United States Attorney Manda M. Sertich appeared on behalf of the United States of America (the "Government"). Attorney Frederick J. Goetz appeared on behalf of Defendant Patrick Jon Evers.

The Court heard testimony from USPS-OIG Special Agent Sarah King (Tr. 15), Defendant Patrick Jon Evers (Tr. 123, ECF No. 35), and USPS-OIG Special Agent Rebecca Wayerski (Tr. 190). The Government offered and the Court received: Exhibit 1, USPS-OIG Acknowledgment of Rights (Garrity) form; Exhibit 2, Defendant's written statement on USPS-OIG Sworn Statement form; Exhibit 3, an audio recording of voicemails left by Defendant for Special Agent Wayerski; Court Exhibit 1, Special Agent King's handwritten notes from the interview of Defendant on January 22, 2015; and Exhibit 5, Special Agent Wayerski's handwritten notes from the interview of Defendant on January 22, 2015.

Post-hearing briefing is now complete and this motion is ripe for a determination by the Court. Based upon all the files, records, and proceedings herein, along with the testimony and exhibits presented, the undersigned Magistrate Judge recommends that Defendant's motion be denied.

## I.   FINDINGS OF FACT

Defendant Patrick Jon Evers is a fifty-three year old high school graduate without any criminal convictions. (Tr. 123:16–124:3, 89:22–90:2, 149:12–15). Defendant can read, write, and understand English. (Tr. 149:16–19). Defendant has been employed with the United States Postal Service ("USPS") for approximately fourteen years. (Tr. 125:12–14). Defendant has physical health concerns stemming from a work injury relating to his hip, sciatic nerve, and herniated disk which prevent him from sitting too long in one position. (Tr. 144:8–16). Defendant takes some medication to treat the pain caused by his health troubles, but it does not impact his mental faculties. (Tr. 150:14–152:2).

On January 15, 2015, Defendant received a phone call from USPS-OIG Special Agent Stephen Pizinger. (Tr. 17:8–17, 20:9–11, 124:7–20, 152:3–7). Special Agent Pizinger identified himself as an agent with USPS-OIG and set a time and location for Defendant to be interviewed by other USPS-OIG agents. (Tr. 18:1–4, 20:9–11, 77:23–78:1 124:7–20, 127:14–19). From his experience as a USPS employee, Defendant understood that USPS-OIG investigated "fraud or illegal things that people were doing at the Post Office." (Tr. 125:15–22, 126:17–22). Defendant stated to Special Agent Pizinger that he hoped he was not in any trouble because he was recently married. (Tr. 152:8–25, 126:6–127:4). Special Agent Pizinger indicated that he was not able to talk about the case over the telephone. (Tr. 125:23–127:4).

Prior to this telephonic contact by Special Agent Pizinger, Defendant had been the subject of a USPS-OIG criminal investigation since approximately June 2013. (Tr. 69:10–71:7). USPS-OIG had gathered Defendant's medical records and conducted

3

approximately ten instances of surveillance of Defendant, including on September 10, 2014, where a USPS-OIG agent posed as a vocational rehabilitation specialist to conduct a "ruse" or "soft" interview. (Tr. 69:10–71:7, 190:22–192:1). USPS-OIG had also been in contact with the United States Attorney's Office for the District of Minnesota regarding the investigation of Defendant since around September 2014. (Tr. 69:10–71:7). Defendant was not told he was subject to a criminal investigation, either during the January 15, 2015 telephone call or during the January 22, 2015 interview, but USPS-OIG had already made the decision to present the case for charging. (Tr. 73:1–74:14).

At around 10:00 a.m. on January 22, 2015, Defendant arrived for the interview by himself via his own vehicle at a large USPS facility in Eagan, Minnesota. (Tr. 127:5–19; 153:1–3; 21:3–27:15, Gov't Ex. 1). Once at the USPS facility parking lot, Defendant called USPS-OIG Special Agent Rebecca Wayerski to advise her of his arrival. (Tr. 27:10–15, 127:17–128:3). USPS-OIG Special Agent Charlie Wilcox went to meet Defendant at the building entrance and then escorted him to the second-floor of the building, to USPS-OIG offices. (Tr. 27:10–15, 127:20–128:11). To get into the building, Special Agent Wilcox escorted Defendant through security doors similar to those at the Post Office location where Defendant works. (Tr. 153:14–20, 78:18–79:12). Once Defendant reached the second floor, he used the restroom. (Tr. 128:9–14, 27:16–18).

After using the restroom, Defendant was escorted to a conference room where he was greeted by USPS-OIG Special Agents Wayerski and Sarah King. (Tr. 128:14–129:21, 27:16–28:16). In the conference room, Special Agents Wayerski and King had previously pushed aside a table and set up three chairs in a circle. (Tr. 27:19–28:1, 79:13–

81:12 129:15–130:2). One of the agents closed the door to the room, but did not lock it. (Tr. 28:2–8). Defendant and the two agents sat down. (Tr. 28:9–12, 80:11–81:12). Defendant and Special Agent Wayerski were in chairs equidistant from the door, but nothing impeded Defendant's path to the door. (Tr. 80:9–81:12). Special Agents Wayerski and King introduced themselves as agents for the USPS-OIG. (Tr. 82:1–3, 28:13–28:16). The agents were not in uniform and their weapons and handcuffs were concealed. (Tr. 28:17–22, 81:13–25). The agents stated that they wished to discuss Defendant's workers' compensation claim. (Tr. 73:25–74:14).

At the start of the interview, Special Agent King informed Defendant that he was not under arrest. (Tr. 28:23–29:7). Special Agent King told Defendant that it was a voluntary interview, that he could leave at any time, and that he would not be arrested at the conclusion of the interview. (Tr. 29:2–7, 154:16–19). Special Agent King gave Defendant a form entitled "Acknowledgement of Rights (Garrity)." (Tr. 29:8–10, Gov't Ex. 1). In the process of handing over this form, Special Agent King explained to Defendant that the form "is a formality of our agency" that includes "some pretty strong language" that "would make it sound like he is on the TV show *Cops*," but she reiterated to Defendant "that he was not under arrest and that he didn't have to worry about that." (Tr. 30:8–15). The form states, and Special Agent King read aloud, that Defendant has been advised by Special Agent King that she is "conducting an investigation into alleged misconduct/improper performance of official duties." (Gov't Ex. 1, Tr. 30:8–23). Special Agent King read the form aloud to Defendant, which includes four numbered paragraphs

initialed by Defendant. (Gov't Ex. 1, Tr. 30:8–31:1). Defendant initialed next to paragraphs which state:

> (1) I have the right to remain silent if my answers may result in a criminal charge being brought against me.
> (2) Anything I say or do may be used as evidence in administrative proceedings, civil proceedings, or any future criminal proceeding involving me.
> (3) If I refuse to answer questions because my answers might result in criminal charges being brought against me, I will not be disciplined solely for remaining silent.
> (4) This interview is strictly voluntary, and I may leave or stop answering questions at any time.

(Gov't Ex. 1, Tr. 30:19–31:1, 156:2–23). Special Agent King then read the final paragraph of the form, which states: "I have read the Acknowledgement of Rights or had them read to me, and I understand them as set forth above. No promise or threats have been made to me and no coercion of any kind has been used against me." (Gov't Ex. 1, Tr. 31:4–22). Defendant did not have any questions about his rights and signed the form at 10:04 a.m. (Gov't Ex. 1, Tr. 31:2–3, 31:16–32:21, 155:20–156:1, 156:23–158:12). The form does not include any language detailing Defendant's rights regarding consulting with a lawyer, having a lawyer present, or having a union representative present. (Tr. 31:10–15, 77:14–22, 131:13–21).

The interview started at 10:04 a.m. with Special Agent King asking Defendant for personal information, including his date of birth, employment history, work injury, and family. (Tr. 33:4–34:7). While talking about his family, Defendant discussed the death of his daughter and the addiction struggles of some of his children. (Tr. 92:7–93:1). Defendant appeared emotionally upset while discussing these topics. (Tr. 92:7–93:1).

Defendant also discussed his wife, whom he had met at the pain clinic where he was receiving treatment for his work injury. (Tr. 110:19-23, 59:9–23). This introductory part of the interview lasted approximately two hours, with a bathroom break halfway through at 11:00 a.m. (Tr. 33:4–34:7, 47:6–48:1). Defendant's responses to questions throughout the interview were "very long and he tended to give more information that [the agents] hadn't asked for." (Tr. 33:14–19).

At around 12:00 p.m., Special Agent King asked Defendant to describe what he was physically able to do and not do as a result of his injury. (Tr. 34:8–21). Defendant and the agents discussed his ability to do several things, such as shoveling snow, using a snowblower, raking, running errands, washing his car, and moving a wicker chair from one house to another. (Tr. 158:17–159:16). Defendant took another bathroom break at 12:22 p.m. (Tr. 47:6–23). Defendant's answer to this question took approximately one hour. (Tr. 34:18–21). During his answer, Defendant mentioned several times that he was concerned he had been watched performing physical activities. (Tr. 34:22–35:9). At around 1:00 p.m., Special Agent King asked Defendant what activities someone would have seen him performing if he had been watched. (Tr. 34:22–35:9). In response to that question, Defendant discussed additional, more strenuous activities than the ones he had previously described. (Tr. 35:10–13, 159:22–162:25). The newly discussed activities included cutting down a tree using a chainsaw, moving twenty-five pound bags of fertilizer using a dolly, planting rose bushes, moving landscaping rock with a wheelbarrow, and doing various exercises at the gym, including bench pressing up to 275 pounds. (Tr. 159:22–162:25).

Defendant took a bathroom break at 1:45 p.m. (Tr. 87:1–7). Upon his return from the bathroom, Special Agent King asked Defendant what Defendant's doctors and USPS management would say if they had seen him performing those more strenuous activities. (Tr. 87:1–88:22). At around 3:06 p.m., Special Agent King indicated that USPS-OIG had previously conducted an undercover interview and video surveillance of Defendant. (Tr. 44:21–45:4). The agents asked Defendant what the doctor would do if made aware of the investigation. (Tr. 45:12–18). Defendant responded that if he had been honest with the doctor, the doctor would have changed his work restrictions or bring him back to work, so he did not want to divulge that information. (Tr. 45:12–18). During this discussion about the Defendant's representations to his doctor, Defendant stated that he had skirted the issue. (Tr. 44:21–45:1, 100:23–101:14, 163:7–164:5). Special Agent King asked Defendant what he meant by skirting the issue, to which he responded that it means withholding the truth. (Tr. 44:21–45:1, 100:23–101:14, 163:7–164:5). Special Agent King then asked Defendant what he meant by withholding the truth, to which he responded that it means he lied. (Tr. 44:21–45:1, 100:23–101:14, 163:7–164:5). During this portion of the interview, Defendant began to cry for a "couple of minutes." (Tr. 44:13–19). Defendant was also asked whether his wife was involved with any wrongdoing, given that she had signed some of his documentation from the pain clinic regarding his work restrictions. (Tr. 141:5–24, 91:25–92:6). This part of the interview concluded at around 4:00 p.m., with a bathroom break at 3:30 p.m. (Tr. 45:19–21, 47:6–48:1).

During the interview, Defendant received several missed cell phone calls from his wife. (Tr. 49:18–50:6). At some point after the 3:30 p.m. bathroom break, Defendant stated that his wife was probably getting worried about him, so the agents said to call her back if he would like to do that. (Tr. 49:23–50:6, Court Ex. 2 at 9). Defendant used his cell phone to call his wife and spoke to her for about five minutes. (Tr. 49:18–50:6, Court Ex. 2 at 9). Neither the agents nor Defendant discussed food around noon, but the agents did ask Defendant if he was hungry at about 4:00 p.m. (Tr. 48:2–49:1). Defendant declined their offer, and then jokingly said that his wife had him on a "bird diet." (Tr. 48:2–49:1). Defendant received two bottles of water during the course of the interview. (Tr. 49:7–17).

At around 4:00 p.m., Special Agent King discussed a written statement with Defendant. (Tr. 50:21–51:12, 95:5–8). Defendant and the agents moved to the table in the conference room, with Defendant sitting at the head of the table and Special Agents King and Wayerski at either side of the table. (Tr. 111:11–25). Special Agent King said that written statements are voluntary, but are an opportunity for Defendant to put his story into his own words and that the statement would accompany the USPS-OIG report sent to USPS management, the Department of Labor, and the United States Attorney's Office. (Tr. 50:21–51:4). At this point, Defendant felt "humiliated, dilapidated," and "wore out." (Tr. 142:9–18). Defendant felt he was free to leave the room if he wanted, but opted not to leave so he could do "damage control," which meant he was "going to do whatever [he] could to try to get [himself] from not going to prison." (Tr. 147:16–148:5, 154:16–19).

The written statement is on a USPS-OIG form entitled "Sworn Statement." (Gov't Ex. 2). On the first page of the statement, it reads: "I, [Defendant], have been interviewed by Special Agent[s] Sarah King [and] Rebecca Wayerski of the [USPS-OIG]. At this time, I desire to make the following statement. I make this decision freely, knowingly, and voluntarily, and without any threats or promises having been extended to me." (Gov't Ex. 2 at 1). Special Agent King then advised Defendant on how to start the written statement with his name, position, and what they had discussed during the interview. (Tr. 51:5–12).

After around twenty minutes, Defendant stopped writing and asked Special Agent King to look it over. (Tr. 53:10–25, 145:24–146:10, 97:3–98:24). At this point, the written statement said the following:[1]

> My name is Pat Evers[.] I am a mail handler for the Postoffice Downtown Mpls PayLoc 320[.] I have been on workmans comp on or around 6-22-10. After talking with investigators on 1-22-15 I have realized that made many mistakes concerning how I conducted myself while on paid leave[.] I understand that I have done wrong. Something I never intended to do and I am truly sorry[.] I never meant any harm or disonesty[.] I never meant to lie but realize that is exactly what I have done. My investigators kindfully showed me my mistakes and Im glad they did[.] Once again I am truly sorry and am willing to do whatever it takes to make what I did right. I mean that and I ask that who this may concern that there might be mercy on my ignorance[.]

(Gov't Ex. 2 at 2). Special Agent King read the statement, followed by Special Agent Wayerski. (Tr. 146:11–15). Special Agent King told Defendant that he admitted to wrongdoing in what he had already written, but he had not specifically said what that wrongdoing was. (Tr. 97:3–98:24, 54:1–10, Tr. 146:11–20). Special Agent King handed

---

[1] The written statement is reproduced as is.

the written statement back to Defendant, who continued to write for an additional twenty

minutes. (Tr. 54:4–10, Gov't Ex. 2 at 4). Defendant added the following to the written

statement:[2]

> My mistakes being not being open and honest about my weightlifting with
> my appt, the vocational rehab specialist or doctors[.] Wanting to tell my
> doctor and or ask If my weightlifting exceeded my restriction[.] I withheld
> information from the rehab appt concerning how much weight I was lifting
> and I told her I wasnt doing freeweights[.] I dont remember telling her that
> we had talked about benchpressing I thought, and that is free weight.[3] But
> after the whole situation was brought to me I realized that I lied. I didnt
> mean to but I lied and I am truly truly sorry. I can percieve how my actions
> could be viewed as misrepresentation of my physical abilities and I take full
> responsibility for them but I never meant to misrepresent any of these
> things and again Im truly sorry for what I have done.

(Gov't Ex. 2 at 2–3). Defendant completed the written statement at 4:40 p.m. (Gov't Ex.

2 at 4). Defendant then initialed each page and signed his named under a paragraph which

reads: "I acknowledge that I have read this statement consisting of 4 pages in its entirety.

I have initialed each page and correction and signed the statement. I declare under

penalty of perjury that the foregoing statement is true and correct." (Gov't Ex. 2 at 4, Tr.

54:18–55:4). Special Agents Wayerski and King signed the written statement as

witnesses. (Gov't Ex. 2 at 4, Tr. 54:18–55:4).

After Defendant completed the written statement, he conversed with Special

Agents King and Wayerski for about twenty minutes. (Tr. 55:5–10). During this part of

the conversation, Special Agent King explained to Defendant that being honest and

remorseful, as well as his lack of a prior criminal record, would be factored in to any

sentencing decision. (Tr. 90:3–91:24, 137:12–20, 138:9–25). Special Agent King

---

[2] The written statement is reproduced as is.
[3] This part of the statement is difficult to read.

discussed with Defendant the importance of having someone to confide in, such as his wife or a friend, and that if he need someone else to talk to he could call the Employee Assistance Program sponsored through the USPS. (Tr. 55:18–56:7). Special Agent Wayerski provided her contact information to Defendant and the agents walked Defendant out of the building. (Tr. 56:8–14).

During the course of the interview, Special Agents King and Wayerski did not raise their voices, verbally threaten Defendant, use profane language, or make any threatening movements. (Tr. 46:1–19, 154:8–15). Defendant was "friendly and open in his conversation" with the agents, apart from when he became emotional discussing his family and when he cried toward the end of the interview. (Tr. 46:11–15).

The following day, January 23, 2015, Defendant left two voicemail messages for Special Agent Wayerski. (Tr. 57:1–60:7). In the first message, left at 8:05 a.m., Defendant said that he wishes to clarify two statements from the day before where he misspoke. (Gov't Ex. 3, Tr. 58:14–59:8). Defendant clarified the date his wife resigned from her position at the pain clinic and further described his weightlifting activity. (Gov't Ex. 3, Tr. 58:14–59:8). Defendant described two exercises where he (1) puts 300 pounds on the bar while doing negatives, where he starts with a fully extended bar and brings it down to a hold, and (2) puts around 315 pounds on the bar to do an exercise where he starts at full extension and comes down a couple inches, in an attempt to strengthen shoulder tendons. (Gov't Ex. 3, Tr. 58:14–59:8). Defendant provided his callback number. (Gov't Ex. 3). In the second message, left at 8:07 a.m., Defendant stated that he spoke with his wife the previous night and wanted to confirm that she had nothing to do

with his work restrictions. (Gov't Ex. 3, Tr. 58:9–23). Special Agent Wayerski called Defendant to thank him for the information. (Tr. 59:24–60:7).

## II.   CONCLUSIONS OF LAW

Defendant moves to suppress statements made, including the written statement, during the January 22, 2015 interview with Special Agents King and Wayerski on the grounds that they were involuntary. Involuntary statements made by a criminal defendant implicate three separate constitutional provisions: (1) the Fifth Amendment's self-incrimination privilege, (2) the Sixth Amendment right to counsel, and (3) the Due Process Clause, which bans the use of involuntary confessions. Under the first theory, courts are guided by *Miranda v. Arizona*, which established a conclusive presumption that all confessions or admissions made during a period of custodial interrogation are compelled in violation of the Fifth Amendment's privilege against self-incrimination, which can only be overcome with a showing by the government that its agents gave the suspect certain warnings of his rights prior to the taking of any statements, and the suspect has knowingly and intelligently waived those rights. 384 U.S. 436 (1966). *Miranda* and its progeny are limited to custodial interrogation, and here, the parties do not dispute that the interview was non-custodial. (Def.'s Mem. of Law in Supp. of Mot. to Suppress Statements at 20, ECF No. 36; Gov't's Br. in Resp. to Def.'s Mot. to Suppress Evidence at 1, ECF No. 37). Therefore, the *Miranda* line of cases is inapposite

to this Court's analysis.[4] Instead, the parties have limited their briefs to the issue of whether Defendant's statements were voluntary or involuntary, thus making their use offensive to Defendant's Due Process rights.[5]

Due process requires that confessions be voluntary. *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961); *Brown v. Mississippi*, 297 U.S. 278, 285–86 (1936). The test is "an inquiry that examines 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession. The due process test takes into consideration 'the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.'" *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)); *accord Mincey v. Arizona*, 437 U.S. 385, 401 (1978). A statement is voluntary if it is "the product of an essentially free and unconstrained choice by its maker." *Schneckloth*, 412 U.S. at 225. On the other hand, a "statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004) (en banc). The government "must prove at least by a preponderance of the evidence that the confession was voluntary." *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

---

[4] Also, the parties do not argue that the second theory, the Sixth Amendment right to counsel, applies to this case. The Sixth Amendment right to counsel does not attach until "at or after the time that judicial proceedings have been initiated against [a defendant], whether by formal charge, preliminary hearing, indictment, information, or arraignment" *Brewer v. Williams*, 430 U.S. 387, 398 (1976). Here, Defendant's statements were made on January 22, 2015, while the indictment was filed April 15, 2015.
[5] Although the parties limited themselves to the issue of voluntariness under the Due Process Clause, they included in their briefs arguments and case law drawn from the Fifth Amendment line of cases. This is not atypical, as the courts have borrowed legal reasoning from the Fifth Amendment cases and incorporated it into cases analyzing statements and confessions under the Due Process Clause.

Involuntary statements are inadmissible at trial for any purpose. *Michigan v. Harvey*, 494 U.S. 344, 351 (1990).

When considering the totality of the circumstances, courts have considered various factors. The inquiry into the characteristics of the accused "depend[s] on the actual mindset of a particular suspect," that is, "whether 'the defendant's will was overborne,' a question that logically can depend on 'the characteristics of the accused.'" *Yarborough v. Alvarado*, 541 U.S. 652, 667–8 (2004) (quoting *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) and *Schneckloth*, 412 U.S.at 226). In reviewing the characteristics of the accused, courts have considered the suspect's age, education, intelligence, size, prior experience with law enforcement, and mental and physical condition. *Yarborough v. Alvarado*, 541 U.S. at 668; *Arizona v. Fulminante*, 499 U.S. 279, 286 n.2 (1991). In looking at the details of the questioning, courts have considered: its length, *Spano v. New York*, 360 U.S. 315 (1959); its continuous nature, *Leyra v. Denno*, 347 U.S. 556, 561 (1954); its location, *Reck v. Pate*, 367 U.S. 433, 441 (1961); law enforcement's use of fear to "break" a suspect, *Malinski v. New York*, 324 U.S. 401 (1945); and promises made by law enforcement, *LeBrun*, 363 U.S. at 725.

When faced with cases where only one factor was present, the Supreme Court and Eighth Circuit have consistently held that a defendant's statements were voluntary. *E.g.*, *Colorado v. Connelly*, 479 U.S. 157 (1986) (found the defendant's confession to be voluntary despite his severe mental illness because there was no evidence of police coercion or overreaching); *United States v. Makes Room for Them*, 49 F.3d 410 (8th Cir. 1995) (found the defendant's confession to be voluntary where the defendant had a

diminished capacity to resist pressure but there was no police coercion); *LeBrun*, 363 F.3d 715 (found the defendant's confession to be voluntary where, although there was ample evidence of police overreaching, defendant did not have a particularly susceptible nature or sensibility); *United States v. Astello*, 241 F.3d 965 (8th Cir. 2001) (same). Therefore, in order to show that a statement was involuntary, Defendant must show that there was law enforcement coercion or overreaching to the extent that his will was overborne, and that he had signs of susceptibility to having his will overborne. *United States v. Klynsma*, 2009 WL 3147790, at *31 (D. S.D. 2009).

In looking at the characteristics of Defendant, this Court finds that he did not have a susceptibility to having his will overborne, and that he did not have a particularly susceptible nature or sensibility. Defendant is a fifty-three year old man that graduated high school and can read, write, and understand English. While Defendant experiences pain stemming from a work injury, this does not affect his mental faculties or stop him from lifting weights. While Defendant has a clear criminal record that would indicate no prior experience with law enforcement, Defendant has been employed by USPS for approximately fourteen years, during which time he gained an understanding that USPS-OIG investigates fraud and other misconduct conducted by postal employees. Thus, Defendant had a general idea of what the January 22, 2015 interview would be about.

At the start of the interview, Defendant was informed that Special Agents King and Wayerski were conducting an investigation into misconduct; that he could remain silent if an answer may result in criminal charges; that anything he said could be used as evidence in a criminal proceeding against him; that he would not be disciplined for

remaining silent; that the interview was voluntary; and that he may leave or stop answering questions at any time. While Defendant testified that he was "wore out" and "dilapidated" at end of the interview, he still felt free to leave the conference room if he wanted. Instead, Defendant decided to stay and complete a written statement to do "damage control." If anything, this shows Defendant's will was not overborne, but that he remained an active participant in the interview.

Based on the evidence, testimony, and record, the Court finds that the activities of law enforcement in this case were not coercive or overreaching. Defendant drove himself to the interview. While Defendant had to pass through several security doors to arrive at a second-floor conference room, this security was similar to that found at the postal facility where he works. The conference room had three chairs set up in the middle of the room, with Defendant and Special Agent Wayerski sitting equidistant to the door and nothing blocking Defendant's path to the door, which was closed, but not locked. Special Agents King and Wayerski identified themselves using their badges, but never displayed their weapons or handcuffs.

At the start of the interview, Defendant read and signed a form detailing his rights. While Special Agent King may have downplayed the importance of the form by alluding to the television show *Cops* and calling it a "formality" which includes "some pretty strong language," the content of the form speaks for itself. Defendant read, and confirmed he understood, that Special Agents King and Wayerski were conducting an investigation into misconduct; that he could remain silent if an answer may result in criminal charges; that anything he said could be used as evidence in a criminal proceeding against him; that

he would not be disciplined for remaining silent; that the interview was voluntary; and that he may leave or stop answering questions at any time. Special Agents King and Wayerski told Defendant that he was not under arrest and would not be arrested at the conclusion of the interview. Defendant argues that the Court should consider the fact that he was not given a rights advisory regarding attorneys or union representatives. Defendant did not ask any questions relating to attorneys or union representatives. This interview was noncustodial and the Sixth Amendment right to counsel had not attached, so Defendant was provided a form detailing his *Garrity* rights and the facts demonstrate he understood them.

The interview portion on January 22, 2015 lasted from about 10:00 a.m. to 4:00 p.m., when Defendant started the written statement. During that time, Defendant took four breaks to use the restroom and another break to call his wife, lasting about five minutes each. While the parties did not take a break to eat, Special Agent King asked Defendant if he was hungry, but he declined saying he was on a "bird diet." Thus, Special Agents King and Wayerski interviewed Defendant for approximately five and one half to six hours. This fact does not make the questioning per se unconstitutionally coercive. *Jenner v. Smith*, 982 F.2d 329, 334 (8th Cir. 1993); *see Stein v. New York*, 346 U.S. 156, 185–86 (1953) (no coercion in twelve hours of intermittent questioning over a thirty-two hour period); *Sumpter v. Nix*, 863 F.2d 563, 565 (8th Cir. 1988) (no coercion in seven and one-half consecutive hours of questioning). Defendant's voicemails and testimony show that he has a tendency to be discursive in his speech. It is fair to conclude that this elongated the interview to some extent. Also, as noted above, Defendant was an active

participant in the interview, staying and answering questions to do "damage control." *See Jenner*, 982 F.2d at 334 (finding willing participation by defendant who was "still alert and in control of her faculties after lengthy questioning").

During the interview, Special Agent King moved from general to specific questions, including hypotheticals. For example, Defendant was asked to describe what activities he can and cannot do as a result of his injury. During this discussion, Defendant expressed he had concerns of being watched. Special Agent King then asked Defendant what someone would have seen had they watched him. Defendant described additional, more strenuous activities. Special Agent King then asked Defendant hypotheticals about what his doctors or postal management would say if they had seen him performing these more strenuous activities. Defendant was then confronted with the fact that he actually had been observed performing activities. When confronted with the fact that USPS-OIG had video surveillance of him performing activities that would likely change his doctor's recommendation towards work restrictions, Defendant indicated that he had "skirted the issue" with his doctor. Special Agent King pressed Defendant to explain what he meant, to which Defendant responded that he had "withheld the truth." Special Agent King again pressed Defendant to explain what he meant by "withholding the truth," to which he responded that he had lied. The Court finds no coercion in this line of questioning. *See Ray v. Duckworth*, 881 F.2d 512, 518 (7th Cir. 1989) ("An interrogating officer's act of merely informing the accused of the nature of the evidence implicating him, without more, does not constitute coercive police conduct."); *see also United States v. Sanchez*,

614 F.3d 876, 885 (8th Cir. 2010) ("Showing a suspect photographs of the victim is not inherently coercive police conduct.") (internal quotation and alterations omitted).

Defendant argues that Special Agent King "implicitly threatened to investigate, prosecute and imprison [Defendant's] wife if he did not make admissions." (Def.'s Mem. of Law in Supp. of Mot. to Suppress Statements at 19–20). Defendant met his wife at the pain clinic where he received treatment for his work injury. As an employee at the pain clinic, Defendant's wife signed off on some of the forms Defendant relied upon in his workers' compensation claim. It is logical that USPS-OIG special agents would ask if she was involved in any misconduct. The Court does not find any coercion in asking such questions. *See United States v. Hewitt*, 07-cr-307 (PAM/JJG), 2008 WL 114899, at *5 (D. Minn. 2008) (statement voluntary where FBI agents told defendant that if he left the interview, FBI "would continue its investigation and take it wherever necessary, including to his wife and children," when defendant arrived at meeting of his own accord, had a calm demeanor, was given refreshments, used the bathroom, and signed a statement at the end of the interview acknowledging that he was told the interview was voluntary); *see also United States v. Goodpaster*, 65 F.Supp.3d 1016, 1021 (D. Or. 2014) (statement voluntary where USPS-OIG agents stated that defendant's wife was also being interviewed in connection with the wrongdoing at issue).

At around 4:00 p.m., Special Agent King discussed a written statement with Defendant, saying it was voluntary, but an opportunity for Defendant to put his story into his own words. Special Agent King indicated that the written statement would accompany her report of the investigation. Despite feeling free to leave, Defendant

decided to stay and complete a written statement to do "damage control." On the first page of the written statement, Defendant read and understood that he was making a statement freely, knowingly, voluntarily, and without any threats or promises having been extended to him. Special Agent King testified that individuals often have difficulty starting out their statements, so suggested that Defendant begin with his name, position, and what they discussed during the interview. The written statement shows Defendant started just that way.

The testimony is clear that Defendant completed part of the statement and handed it to Special Agents King and Wayerski for review. What Defendant had written up to that point included apologies for wrongdoing, but did not identify the wrongdoing itself. Special Agent King indicated this to Defendant. Defendant then finished the statement, discussing his weightlifting and how he had not communicated that to his treating doctors.

After completing the statement, Defendant conversed with Special Agents King and Wayerski for about twenty minutes. Special Agent King discussed the sentencing guidelines with Defendant, explaining that remorsefulness and lack of a criminal record are factors considered. Defendant argues that he was threatened with prison time, constituting impermissible law enforcement coercion. The Court finds it likely that he misinterpreted this discussion, but even if Defendant's arguments were true, it would not render his statements involuntary. *Simmons v. Bowersox*, 235 F.3d 1124, 1133 (8th Cir. 2001) ("a truthful and noncoercive statement of the possible penalties which an accused faces may be given to the accused without overbearing one's free will") (citations

omitted); *United States v. Meirovitz*, 918 F.2d 1376, 1379 (8th Cir. 1990) (statement voluntary where law enforcement informed defendant of seriousness of charge and probable tough, long sentence).

Defendant also argues that his statement was coerced because he was "promised favorable disposition if he made admissions." (Def.'s Mem. of Law in Supp. of Mot. to Suppress Statements at 21). Before completing his written statement, Special Agent King indicated that the statement was an opportunity for Defendant to put his story into his own words and that it would accompany her report sent to the prosecutor. As noted above, Special Agent King also discussed the sentencing guidelines with Defendant, explaining that remorsefulness is a factor considered when determining sentence length. But, even if Defendant had misinterpreted the tenor of these two discussions to mean he was promised favorable disposition, it would not render his statements involuntary. *Simmons v. Bowersox*, 235 F.3d at 1133 (informing defendant that it would be in his best interest to cooperate "does not constitute an implied or express promise of leniency for the purpose of rendering his confession involuntary"); *Tippitt v. Lockhart*, 859 F.2d 595, 597 (8th Cir. 1988) ("Government agents may initiate conversations on cooperation" and "may promise to make a defendant's cooperation known to the prosecutor . . . without rendering a resulting confession involuntary.").

After applying the totality of the circumstances test, the Court finds that Defendant's will was not overborne. This is a "demanding standard" and "the facts of this case do not rise to that level." *LeBrun*, 363 F.3d at 726. Defendant has no cognizable susceptibility to having his will overborne, and the Court finds lacking the requisite

coercive or overreaching conduct on behalf of law enforcement. Several additional facts bolster this finding. The day after the interview, Defendant left two voicemails for Special Agent Wayerski clarifying statements he had made the day before. Defendant clarified how much weight he could lift in specific exercises, and actually explained that he had put 300 to 315 pounds of weight on the bar, up from the 275 pounds described at the interview. Defendant also clarified his wife's date of resignation from her position at the pain clinic and reiterated that his wife had nothing to do with his workers' compensation claim. These were not messages left in an attempt to backtrack on the previous day's admissions. Instead, they show Defendant's voluntary participation in answering the questions of USPS-OIG investigators.

Based on the foregoing, the Court concludes that, under the totality of the circumstances, Defendant's statements were voluntary. Therefore, the Court recommends that Defendant's Motion to Suppress Statements (ECF No. 27) be denied.

[Continued on next page.]

## III.    RECOMMENDATION

Based upon the foregoing, and all files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements (ECF No. 27) be **DENIED**.


Date:  September 22, 2015                          _____s/ Tony N. Leung_____
                                                                     Tony N. Leung
                                                                     United States Magistrate Judge
                                                                     District of Minnesota

                                                                     *United States v. Evers*
                                                                     File No. 15-cr-114 (MJD/TNL)


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.